## In re MACON UPLANDS VENTURE, a Limited Partnership, Debtor.

### Bankruptcy No. 79-2-1862-L.

United States Bankruptcy Court, D. Maryland.

Jan. 22, 1980.

See also, Bkrtcy., 2 B.R. 429.

Charles M. Tatelbaum, Stephen F. Fruin, Sherbow, Shea & Tatelbaum, Baltimore, Md., for debtor Macon Uplands Venture.

E. Stephen Derby, Piper & Marbury, Baltimore, Md., for Metropolitan Life Ins. Co.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDERS WITH RESPECT TO TRANSFER

HARVEY M. LEBOWITZ, Bankruptcy Judge.

On October 17, 1979, Macon Uplands Venture ("Debtor") filed in this court an Original Petition under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101 et seq. ("Code"). This court has issued two previous Opinions with respect to issues presented in this case, the first on November 5, 1979, 2 B.R. 421, and the other on December 11, 1979, 2 B.R. 435. The facts and the issues involved have been set out at length in those Opinions. The Opinion of November 5, 1979, was issued in response to a Motion to Dismiss, Or, In The Alternative, To Transfer Case filed by Metropolitan Life Insurance Company ("Metropolitan"). In that Opinion, it was determined, *inter alia,* that this court could entertain and retain jurisdiction over a Chapter 11 case filed under the Code, notwithstanding a pending appeal in the United States District Court for the Middle District of Georgia from a dismissal of a Chapter XII case originally filed in this District by the same debtor under the Bankruptcy Act of 1898, as amended, and then transferred to the Middle District of Georgia. This court further indicated that an evidentiary hearing would be held to determine whether the Chapter 11 case should be retained in this District or transferred to the Middle District of Georgia or some other Bankruptcy Court. In its Opinion of December 11, 1979, this court concluded, *inter alia,* that it is this court which is to determine if and where the Chapter 11 Code case is to be transferred, that such transfer could not be directed or initiated by the United States District Court for the Middle District of Georgia, and that should the Chapter 11 case be transferred to the Middle District of Georgia, such transfer must be to the United States Bankruptcy Court for that District and could not be transferred to the District Court and consolidated with the appeal pending in that court.

An evidentiary hearing on Metropolitan's Motion with respect to transfer was held in this court on December 28, 1979, at which time witnesses were called, testimony was taken, and evidence was introduced. The following persons appeared: the Debtor, by its attorneys, Charles M. Tatelbaum, Stephen F. Fruin, and Jay Scott Smith; and Metropolitan, by its attorney, E. Stephen Derby. Also present were Lowell H. Hughen and Carol Clark of the Atlanta law firm of Hansell, Post, Brandon and Dorsey,

Georgia counsel for Metropolitan, and Christine Wadsworth, an attorney with Metropolitan.

As a part of Metropolitan's opening statement, Mr. Hughen was permitted to make a narrative presentation of the proceedings that have occurred in Georgia in connection with the Chapter XII case. Mr. Tatelbaum, in reserving his opening statement, indicated that Mr. Hughen did a very "presentable job of giving a narrative as to what happened in the prior proceeding and it would be superfluous for [him] to go through." Mr. Hughen's presentation will be given consideration by this court only to the extent that it describes the nature and extent of the Georgia proceedings in the Chapter XII case.

Counsel have requested the court to take judicial notice of certain documents and pleadings filed in this case. The court, having read and considered those documents and pleadings, as well as other pertinent documents and pleadings filed in these proceedings, the exhibits admitted into evidence at the hearing, the testimony of the witnesses, arguments of counsel, and memoranda of law filed herein, makes the following findings and conclusions:

## APPLICABLE LAW

The question of the transfer of a case under Chapter 11 of the Bankruptcy Code is governed by § 1475 of Title 28, United States Code. Section 1475 is to be compared with § 1477, 28 U.S.C.; the former concerns both the change of venue of cases originally filed in either the proper venue or the wrong venue, whereas § 1477 only deals with transfer of cases filed originally in the wrong district. 1 Collier on Bankruptcy ¶ 3.02[4][a] at 3–196 (15th ed. 1979). This court by its Memorandum Opinion of November 5, 1979, determined that this case was "properly filed and that this court has jurisdiction over same." Opinion, p. 422. In the circumstances where jurisdiction exists and venue is proper, as here, § 1475 is applicable.

Section 241 of the Bankruptcy Reform Act of 1978 enacted § 1475 which is now applicable during the transition period between October 1, 1979, and April 1, 1984, *see* Bankruptcy Reform Act § 405(b), and which will become permanently effective on April 1, 1984, *see* Bankruptcy Reform Act § 402(b). Section 1475, entitled "Change of Venue", provides:

> A bankruptcy court may transfer a case under title 11 or a proceeding arising under or relating to such a case to a bankruptcy court for another district, in the interest of justice and for the convenience of the parties.

Thus, the test for transferring a properly filed case is twofold: the interest of justice *and* the convenience of the parties. 1 Collier on Bankruptcy ¶ 3.02[4][b] at 3–198 (15th ed. 1979). This standard under § 1475 is the same as it was under Bankruptcy Rule 116(b)(1) and the cases decided thereunder remain persuasive. *Id.,* ¶ 3.02[4][d] at 3–202.

Courts of bankruptcy in deciding questions of transfer have long considered several factors including: (1) the proximity of creditors of every kind to the court; (2) the proximity of the debtor to the court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; and (5) the economical and efficient administration of the estate. *In re United Button Co.,* 137 F. 668, 672–3 (D.Del.1904) (factors for transfer espoused and applied, transfer denied); *In re Bankers Trust,* 403 F.2d 16, 23 (7th Cir. 1968) (improper venue, factors for transfer applied, transfer denied); *In re Theodore Wayne Zonker, et al.,* 2 Bankr.Ct.Dec. 281, 8 C.B.C. 132 (N.D.Tex.1976) (factors for transfer applied, transfer granted); *In re Armando E. Jaconetti,* 2 Bankr.Ct.Dec. 661, 9 C.B.C. 96 (W.D.Wisc.1976) (factors for transfer applied, transfer granted); *In re Twentieth & Penrose Associates,* 4 Bankr. Ct.Dec. 802 (E.D.Pa.1978) (factors for transfer applied, transfer denied). The courts have also used the twin tests of "convenience of parties" and "in the interest of justice" to give consideration to the following factors in connection with the transfer of a particular proceeding within a case

such as: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling, and the cost of obtaining the attendance of willing, witnesses; (3) the enforceability of judgment if one is obtained; (4) relative advantages and obstacles to fair trial; (5) a local interest in having localized controversies decided at home; and (6) a trial in the state the law of which will govern the action. 1 Collier on Bankruptcy ¶ 3.02[4][b] at 3–200, 3–201 (15th ed. 1979) and cases cited therein. These criteria are relevant under § 1475, *id.*, and are to be applied on a case-by-case basis. The burden of establishing that the case should be transferred is on the moving party, Metropolitan Life Insurance Company, and must be shown by a fair preponderance of the evidence. *United Button*, 137 F. at 673; *In re Triton Chemical Corp.*, 46 F.Supp. 326, 328 (D.Del.1942). It is the opinion of this court that the facts and circumstances which existed at the time of the filing of the petition in Chapter 11 are those which are significant in determining whether the case should be transferred, not the facts as they existed when the Chapter XII case was filed.

### FINDING OF FACTS

1. The Debtor is a limited partnership organized pursuant to the laws of the State of Georgia. Uplands, Inc., the General Partner, is a Maryland corporation, having its principal office in Baltimore. There are six (6) limited partners of the Debtor all of whom reside in Metropolitan Baltimore.

2. The principal asset and the only operating business asset of the Debtor is the Macon Hilton Hotel located in Macon, Georgia (sometimes referred to as the "Hotel"). The Hotel is operated under a franchise from Hilton Inns, Inc.

3. The Macon Hilton Hotel is not managed by the Debtor, but instead, Metropolitan Hotels, Inc., a Maryland corporation having its offices in Baltimore at the same address as that of the Debtor, is employed by the Debtor to supervise the management of the Hotel.

4. The Macon Hilton Hotel is only one of four hotels managed by Metropolitan Hotels, Inc. It also manages the Baltimore Hilton Hotel located in Pikesville, Maryland, the Annapolis Hilton Inn located in Annapolis, Maryland, and the Erie Hilton located in Erie, Pennsylvania.

5. William Siskind is the president of Uplands, Inc. and Metropolitan Hotels, Inc., and has an interest, directly or indirectly, in the other hotels. James Clyde McPherson is employed by Metropolitan Hotels, Inc., not by the Debtor, and has been the comptroller of Metropolitan Hotels, Inc. since September, 1979. He was the assistant comptroller from September, 1978, to September, 1979.

6. Both Mr. Siskind and Mr. McPherson testified at the hearing regarding the procedures currently being utilized with respect to the operation of the Macon Hilton Hotel. According to their testimony, operational and administrative functions are performed both in Baltimore and at the Hotel in Macon. The procedure currently being used is essentially as follows:

(a) The comptroller of Metropolitan Hotels, Inc., Mr. McPherson, is located in Baltimore; however, there is also a comptroller of the Hotel operation who is located at the Hotel.

(b) The decisions of the Macon Uplands Venture Partnership are made in Baltimore.

(c) All bank accounts are presently maintained in Baltimore; however, immediately prior to the filing of the Chapter 11 case, some accounts were maintained at First National Bank in Macon. After the filing of the Chapter 11 case, the Debtor attempted to open accounts at various Macon banks without success. The court finds that it is only by virtue of the fact that the Debtor was unable to establish bank accounts in Georgia that all bank accounts are presently maintained in Baltimore.

(d) Financial records and ledgers are kept in Baltimore, but the information from which they are compiled originates at the Hotel and is forwarded by personnel at the

Hotel. Cash receipts and disbursements journals and daily reports are maintained and compiled at the Hotel. Journals are forwarded to Baltimore once a month, and daily reports are forwarded two or three times a week.

(e) Cash received at the Hotel is taken to a bank in Macon. A cashier's check is obtained and sent to Baltimore, along with checks and credit card charges received at the Hotel. The checks are deposited in the Macon Venture DIP account maintained in Baltimore.

(f) Bills are approved by Mr. Siskind and Mr. McPherson. Payment is made through the Debtor's operating account maintained in Baltimore. However, the checks are physically drawn and issued at the Hotel in Macon and countersigned by Janice Davis, the comptroller located at the Hotel, and Joe Kreit, the general manager of the Hotel, who also resides at the Hotel. Each month, based on normal usage, 250 blank checks from the operating account are sent to the Hotel, and funds are transferred to the operating account on Monday morning from a forecast of what is needed by the Hotel for the week.

(g) Employees' time cards are maintained and reports are completed by personnel at the Hotel and sent to Baltimore. The time records are audited by personnel in the accounting office located at the Hotel.

(h) Projections are made in Baltimore with input from the Hotel's general manager and historical data.

(i) The cash register tapes are kept at the Hotel and only random samplings are forwarded to Baltimore upon request of Mr. McPherson, and he has requested tapes only twice in the last six (6) months. Daily food and beverage reports are prepared in Macon, and copies are sent to Baltimore.

(j) The management company relies entirely upon the information being sent to it from the Hotel by way of journals and daily reports, after it audits and reviews the information through the internal controls that are contained in the system it uses to assure that the data is valid.

(k) The management company utilizes the date processing services of a computer company located in Maryland.

(l) Financial reports are prepared in Baltimore.

(m) There are a total of nine (9) people in Baltimore who have something to do with the Hotel; but only the one person who does the ledger actually works directly on the Macon Hilton Hotel.

(n) The total number of employees per week at the Hotel is approximately 162.

(o) Personnel located at the Hotel have the responsibility for its day-to-day operations. The general manager is in charge of all day-to-day operations, excluding the accounting department which is under the jurisdiction of Mr. McPherson in Baltimore. The accounting department located at the Hotel consists of four (4) people. The department heads (housekeeping, maintenance, sales, front desk) also have administrative responsibilities for the daily operation of the Hotel. None of the daily functions of the general manager could be handled from Baltimore.

7. The court finds from the testimony that under the procedure utilized by the Debtor, the Debtor in Baltimore exercises little, if any, management control of the Hotel, and whatever management control is being exercised, is exercised by the management company, Metropolitan Hotels, Inc. Neither the management company nor the Debtor in Baltimore exercises any substantial degree of direct operational control of the Hotel. The day-to-day operation, management, and administration of the Hotel is conducted by personnel at the Hotel, through the general manager and the department heads.

8. The court finds that because some financial books and records and the source materials are maintained at the Hotel and because other books and records are maintained in Baltimore, if there is to be a complete examination or audit, it must be either at both locations or all of the information must be assembled at one place or another.

9. Under the present method of operation, Mr. Siskind visits the Macon Hilton Hotel about every sixty (60) days; Mr. Whittle, of the mechanical department of the management company, has visited the Hotel about six (6) times during the last six (6) months on an "as needed" basis; and Mr. McPherson has not visited the Hotel since July, 1979. When Mr. McPherson goes to the Hotel to review the operations, he usually stays two (2) or three (3) days. It is also the practice under the present method of operation for personnel from the Macon Hilton Hotel to come to Baltimore, and at least two (2) meetings have been held in Baltimore with Janice Davis, the comptroller at the Hotel, the last one being from the 17th through the 21st of December, 1979.

10. On February 17, 1978, the Debtor filed an Original Petition under Chapter XII of the Bankruptcy Act of 1898, as amended, in the United States District Court for the District of Maryland. Metropolitan filed a motion to transfer the case to the United States District Court for the Middle District of Georgia. On March 30, 1978, Joseph O. Kaiser, Bankruptcy Judge, entered an Order transferring the case to the Middle District of Georgia, "it appearing that transfer of this proceeding to the United States District Court for the Middle District of Georgia would be in the interest of justice and for the convenience of the parties." The Chapter XII case was actively administered by W. J. Patterson, Bankruptcy Judge for the Middle District of Georgia, from April 18, 1978, until the Chapter XII case was dismissed by Judge Patterson on October 1, 1979, by Order of that date affirming a prior dismissal of July 13, 1979, following a remand by the United States District Court for the Middle District of Georgia. As a result of the proceedings before Judge Patterson, he became familiar with the Debtor and the Macon Hilton Hotel.

11. The Debtor filed an Original Petition under Chapter 11 of the Code in this court on October 17, 1979. Along with the Petition, Debtor filed a list of its creditors and their addresses. Exclusive of the Debtor and its attorney, the list contains the names and addresses of 197 creditors, 129 of which are from Georgia and 84 of those are from Macon proper. There are 12 from Maryland, 47 from elsewhere in the country, and 9 with no addresses.

12. In addition, there are three secured creditors which do not appear to be shown on the list of creditors filed in this Chapter 11 proceeding.

(a) Metropolitan is the major secured creditor of the Debtor, holding a first lien on the Macon Hilton Hotel. As of October 1, 1979, Metropolitan was owed $3,369,246.05 with interest accruing at the rate of $631.565 per day, or $18,946.77 per month, and has not received any payment on principal since November 1, 1977. Metropolitan's loan is being administered through its office located in Atlanta, Georgia.

(b) First National Bank and Trust Company holds a second lien on the Macon Hilton Hotel and, as of June 19, 1978, was owed $2,455,422.51. Its principal place of business is in Macon, Georgia.

(c) Greater Macon Developments, Inc. holds a third lien on the Macon Hilton Hotel and, as of July 14, 1978, was owed $750,000 plus interest. Its principal place of business is in Macon, Georgia.

13. Debtor argues that the court should consider not only the number of creditors, but also the magnitude of the amount owed to specific unsecured creditors in determining what would be most convenient to the largest unsecured creditors. No schedules have yet been filed in the Chapter 11 case pending in this court. However, the Debtor has represented to the court that the largest unsecured creditors as to amount would be the same as shown on the schedules and the proofs of claim filed in the Chapter XII case and has introduced into evidence the claims docket (Debtor's Exh. # 14) and Schedule A–3 (Debtor's Exh. # 15) filed in that case.

(a) The largest block of unsecured creditors shown on Schedule A–3 are entitled "Inter-company payable and accrued operational," (i. e., monies owed by the Debtor

primarily to the companies in which Mr. Siskind has an interest) in the amount of $1,266,868.26, which may, after off-sets of receivables, be reduced to approximately $800,000. Only one of these creditors, however, is shown on the list filed with the Petition in the Chapter 11 case. Even if they are to be considered, the Debtor has conceded that the location of these creditors should not be given as much weight as the location of the non-affiliated creditors in determining whether the case should be transferred. The court agrees and finds that significantly more weight must be given to the location of non-affiliated creditors since those obligations were incurred in the normal and ordinary course of business of the Hotel, are not a part of inter-company dealings or relationships, and will require each specific creditor to participate on an individual basis, whereas, with respect to inter-company transactions, in all probability only one or two representatives will participate on behalf of all of those companies.

(b) In addition to the inter-company payables, Schedule A–3 indicates that there are other unsecured creditors, designated as "trade creditors", totalling $153,676.92. Of that amount, Debtor represents that approximately $96,000, in the aggregate, is owed to various companies which are affiliated or related to the Hilton Hotel Corporation. Each company in the Hilton group is listed as a separate creditor and they are located in Beverly Hills, California. The Hilton Hotel Corporation does maintain its Southeastern district office in Atlanta; however, the Debtor asserts that this office provides only operational assistance and is not involved in credit or financial matters of the Hilton franchisees. Assuming that Hilton's office in Atlanta is in no way involved in the financial affairs of the Debtor and that the court should give considerable weight to the amounts due the Hilton group in determining the interest of justice and convenience of the parties, the court, nevertheless, finds that it is not substantially less convenient for the Hilton personnel from California to attend and participate in proceedings in Macon than it would be to attend and participate in proceedings in Baltimore.

14. The Debtor suggests that under the Code a Creditors Committee will be required to be appointed from among the seven largest unsecured creditors and that Macon will not be convenient to these creditors. If Debtor's Exhibits # 14 and # 15 can be used as a guide, it appears to the court that from the cross section of creditors required to be appointed to a Creditors Committee, exclusive of the Siskind related companies, among the larger unsecured creditors, without priority, there could be three of the Hilton group of companies, Georgia Light & Power, Atlanta Coca Cola Bottling Co., Mary Carter, d/b/a Star Cleaners of Warner Robins, Ga.; Georgia Tel. & Tel., and Hertz Commercial Leasing Corp. in New York. The court therefore finds that some of the larger unsecured creditors shown on Debtor's Exhibits # 14 and # 15 are from Georgia. The court further finds that until Schedules are filed in the Chapter 11 proceeding, it is impossible to determine with any amount of certainty who the seven largest creditors will be and whether they would be willing to serve if appointed; therefore, this is not a material element for the court to consider in determining whether the case should be transferred.

15. From the list of creditors filed with the petition in this Chapter 11 case, it appears that many of the trade creditors are from Georgia and that many of them are from the Macon area. Without schedules, it is not possible to determine the amounts due these creditors. Using Debtor's Exhibits # 14 and # 15 as a guide, it appears that most of the trade creditors from Georgia are for relatively small amounts. An important factor is the proximity of the court to the greatest number of creditors of every kind to allow maximum creditor participation. It is unreasonable, for economic reasons, to expect a large number of relatively small creditors to come to Baltimore even if they wished to attend a hearing and they would not effectively have an opportunity to be heard in person.

16. The extensive participation of the Debtor will be required in these proceed-

ings. Based on the testimony of the Debtor's witnesses, the court finds that it would not be particularly inconvenient for the Debtor to participate in the proceedings if they were held in Georgia. A number of the Hotel's employees, such as the general manager and the comptroller of the Hotel, may be necessary for the conduct of these proceedings and may be called as witnesses. Under the Debtor's method of operation, the personnel from the management company and the general partner of the Debtor currently travel back and forth to some degree between Macon and Baltimore in the normal course of their business activities. They may also be called as witnesses. It does not appear to be any more of an inconvenience to the Debtor if the proceedings are conducted in Baltimore or in Macon since people will have to travel one way or the other in any event.

17. The court further finds that the past experience regarding the magnitude of creditors' participation with respect to the Chapter XII case is not relevant to the Chapter 11 case and it would be mere conjecture to attempt to predict the number of creditors who may desire to actively participate in the Chapter 11 case.

18. The court finds that any appraisals of the Hotel which may be required will of necessity have to be made by appraisers who are familiar with the Macon real estate market.

19. The court finds that since the property is located and being operated in Georgia, rulings may be required to be made in accordance with the laws of the State of Georgia. The United States Bankruptcy Court for the Middle District of Georgia would be in a better position than this court to make those rulings.

20. The court finds that this case would be more conveniently administered by the court which is closest to the property and to the majority of the creditors, since that court would be in the best position to meet any emergency situations that may arise; answer inquiries which may be raised; grant approvals and authorizations that may be requested; and be in closer touch with the property, its condition and operation; and be in a better position to evaluate any appraisals and the appraisers who make such appraisals.

21. The Debtor has urged the court to consider other factors which it believes would demonstrate that the interests of justice will not be served if this case is transferred to Georgia.

(a) One argument advanced by the Debtor is that Bankruptcy Judge Patterson, through his rulings in the Chapter XII case, has already made certain findings of fact and conclusions of law dealing with the operation of the Hotel, and that because of his predisposition, he should be precluded from presiding in the Chapter 11 case. The facts and circumstances existing at the present time may be substantially different than they were at the hearing conducted by Judge Patterson which began on February 26, 1979. Furthermore, it is the province of Judge Patterson, and not of this court, to determine whether he should preside over the proceedings in the Chapter 11 case. Any recusation of Judge Patterson should be determined in Georgia and not here.

(b) Another argument advanced by the Debtor is that Judge Patterson's prior involvement in the Chapter XII case would preclude him from participating in the Chapter 11 case since the knowledge he has already obtained in that case would be violative of the spirit of the Code. Neither counsel for the Debtor nor counsel for Metropolitan can point to any specific provision of the Code which would prohibit Judge Patterson from presiding in the Chapter 11 case. Again, it is the province of Judge Patterson, and not of this court, to make the determination as to whether his past involvement would violate the spirit of the Code and thereby preclude him from participating in the Chapter 11 case.

(c) The Debtor expresses concern over prior actions taken by Honorable Wilbur D. Owens, Jr., United States District Judge for the Middle District of Georgia, and, in particular, with respect to his outstanding Order of November 20, 1979. In that Order, Judge Owens, *inter alia*, directed that the

Chapter 11 case "is transferred to the United States District Court for the Middle District of Georgia and consolidated with" the appeal now pending in that court. On December 11, 1979, this court issued a Supplemental Opinion and Order and, in denying Metropolitan's Order Transferring Case, held, *inter alia*, that if the Chapter 11 case were to be transferred to the Middle District of Georgia by this court, it could only be transferred to the United States Bankruptcy Court for that District, not the District Court, and could not be consolidated with the appeal pending in the District Court. Counsel for Metropolitan agrees that if a transfer be made, it is to be made to the Bankruptcy Court, and the Bankruptcy Court would then make such determinations as are consistent with the Code. The Debtor, nevertheless, fears that if this case were transferred to the Middle District of Georgia, it would not be administered, but would be consolidated with the appeal in the District Court pursuant to Judge Owens' Order. The Debtor concedes, however, that this is speculation predicated on the prior actions taken in Georgia. This court is not unmindful of the Debtor's concern, nevertheless, the court can not indulge in speculation with respect to the future actions of the Bankruptcy Court following the transfer of the case. It must be presumed that another Bankruptcy Court will act in accordance with the requirements of the law and in conformity with the Bankruptcy Code. If the Debtor is dissatisfied with any of the rulings made in Georgia by Judge Patterson or by Judge Owens, the proper avenue for redress would be to appeal from those rulings.

## CONCLUSIONS OF LAW

1. Under § 1475 of Title 28, United States Code, a properly filed case may be transferred to another district "in the interest of justice and for the convenience of the parties."

2. The burden of establishing that the case should be transferred is on Metropolitan Life Insurance Company and must be shown by a preponderance of the evidence.

3. Due consideration having been given to the significant factors to be considered in deciding questions of transfer, the court concludes from the facts and evidence that Metropolitan Life Insurance Company has sustained its burden of proof in establishing that the Chapter 11 case, filed by the Debtor in this court on October 17, 1979, should be transferred to the United States Bankruptcy Court for the Middle District of Georgia, at Macon.

4. The Chapter 11 case is being transferred for the purpose of the administration of that case in accordance with the provisions of the Bankruptcy Reform Act of 1978.

## ORDER

IT IS THEREFORE,

ORDERED, That the Chapter 11 case filed in this court by Macon Uplands Venture on October 17, 1979, be and it hereby is, transferred to the United States Bankruptcy Court for the Middle District of Georgia, at Macon, for the purpose of administration of that case in accordance with the provisions of the Bankruptcy Reform Act of 1978; and it is further

ORDERED, That the Clerk of this court be and he hereby is directed to transfer all papers on file in this case, and a copy of the docket in this case, to the United States Bankruptcy Court for the Middle District of Georgia, at Macon.