### In re INTERNATIONAL FILTER CORPORATION, Debtor.

### Bankruptcy No. 83 B 1080.

United States Bankruptcy Court, S.D. New York.

Oct. 25, 1983.

Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff; Meyer G. Koplow and Amy R. Wolf, New York City, of counsel.

James E. Pratt, New York City, for debtor.

Cornelius Blackshear, U.S. Trustee by Harold Jones, Asst. U.S. Trustee and John Campo, for the U.S. Trustee.

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

### INTRODUCTION

Loren Huweiler, a shareholder of the Debtor and guarantor of its obligations to Foothills Capital Corporation, has moved this Court to transfer this case to The United States Bankruptcy Court for the Central District of California pursuant to 28 U.S.C. § 1475 on the grounds that the case was filed in a district lacking proper venue (see 28 U.S.C. § 1472) and should not be retained under 28 U.S.C. § 1477. The United States Trustee for the Southern District of New York has joined in the motion.

This case is an intracorporate dispute cast in the guise of a venue motion. Huweiler, the former Chief Operating Officer of International Filter Corporation ("IFC"), vigorously opposes the efforts of one Richard Walden, a white knight who owns 60% of the shares issued by IFC, and the IFC Board of Directors who own most of the

rest of the stock, in their efforts to rehabilitate the company.

This case also involves serious breaches of bankruptcy practice, as codified in the Bankruptcy Code. It is difficult to imagine a debtor more ill-advised than IFC. Its initial counsel served for over three months without being appointed by this Court pursuant to § 327 of the Bankruptcy Code ("the Code") and Rule of Bankruptcy Procedure 5002. He may not have been disinterested as required by § 327 in that the evidence adduced at the hearing on this motion indicates that he, during his tenure as attorney, served as a member of the Board of Directors of the Debtor and, also, represented Mr. Walden individually.

After the petition was filed the Debtor, without the approval of this Court pursuant to § 363 and § 364 of the Code, entered into a financing agreement providing for the pledge of the Debtor's accounts receivable. Similarly, the Debtor has paid at least one pre-petition creditor in full after the petition was filed and caused others to be paid post-petition by management after assigning to management its accounts on the eve of bankruptcy apparently for that express purpose. Accountants were appointed without the approval of this Court and financial statements filed with the Court and The United States Trustee's office are, admittedly, erroneous.

## I

IFC is a Nevada corporation having its assets and headquarters in California. (See Dr.Ex.L.R. 367).[1] Only six of the 119 entities named in a list of pre-petition creditors annexed to the petition are not located in California. Sixty percent of its issued and outstanding stock is held by Mr. Walden, a resident of Binghamton and New York, N.Y. The remaining shares are held by California residents, including IFC board members.

The motion to change the venue of this bankruptcy proceeding is, in large degree,

the latest step in an intracorporate dispute over the role the movant, Loren Huweiler, is to play in IFC's corporate affairs. Briefly, from the evidence at the hearing it appears that IFC was founded in August, 1981 by Joseph Stein, Boyd Agnew and Huweiler for the purpose of designing and manufacturing certain rigid disc filters for the computer industry.

Prior to May, 1983, Huweiler served as President, Chief Operating Officer and Treasurer; Stein served as Chairman; Agnew was in charge of production and quality control. Thinly capitalized at the start of entering the heavy seas of competition, (R. 239) IFC was immediately set back when its sole customer claimed that IFC filters contaminated the discs in which they were placed (R. 61–62). Although the manufacturing problem was cured in early 1982, IFC never truly recovered. By December, 1982 its cash flow was negative and IFC encountered difficulty in meeting its payroll (R. 241).

Accordingly, IFC sought additional funds from many investors in order to stay afloat (R. 247–50). Among these was one Richard Walden. Walden specializes in investing, with several acquaintances, in closely held companies. He first met with Stein and Huweiler in February, 1983 (Dr.Ex.A; R. 15). Their discussions continued until mid-May, 1983 when, as Huweiler states, "time became of the essence." Walden's first proposal was declined on May 23, 1983. His second proposal was accepted on May 31, 1983 at a meeting of the IFC Board of Directors, subsequently found by the Superior Court of the State of California, County of Riverside, to have been regularly called. (Dr.Ex.K).

In implementing that proposal, IFC issued sufficient stock to Walden so that he owned 60% of the outstanding shares (R. 15, 18), installed Walden as President and Chief Executive Officer, and Agnew as Senior Vice-President and Chief Operating Officer

---

1. References to "Dr. Exs." are to the Debtor's exhibits; references to "H Exs." are to the movant's exhibits; references to "R" are to the record of the hearing held on September 14th and 15th, 1983.

(Dr.Ex. I), filed a petition for reorganization under Chapter 11 of the Bankruptcy Code with the Clerk of the Court and, after the petition was filed on June 1, 1983, entered, apparently as Debtor-in-Possession, into a factoring agreement with a company controlled by Walden. That agreement provided for up to $500,000 in loans to IFC by that company payment of which is secured by a security interest in IFC's inventory and assignment of its accounts receivables (Dr. Ex. J, the "Walden Factoring Agreement").

Seemingly key to the proposal was the dismissal of Huweiler from his positions with IFC. Huweiler even agreed to drop his challenge to the venue of this proceeding were the Debtor to accept his proposal calling for him to serve in management. The Debtor has refused.

Although they dispute placement of the blame for the financial circumstances during IFC's two years of existence, the parties do agree that in May, 1983 the company was in serious need of additional capital and that it enjoyed a negative net worth of over $400,000 (see R. 24, 81, 223). Quantifying its position at that time is, however, difficult, if not impossible, due to the apparent dearth of accurate IFC financial statements prepared either before or after May 31, 1983.

For example, Huweiler testified that IFC could break even on net sales of $100,000 per month (R. 82). A financial statement prepared during May, 1983 would indicate that that benchmark had already been reached (H. Ex. 15). Practically all that can be said with any degree of certainty is that in late May IFC lacked working capital, had May, 1983 net sales of $104,000 and forecast an upward spiral of sales and, thus,

profits, totally at variance with its past performance (H. Ex. 15). These sales were said to be based on firm orders. According to Mr. Agnew, many of the orders did not exist and lower sales were realized (R. 309–311). Nevertheless, it does appear that sales during June and July, 1983 have increased slightly (H. Exs. 8, 10), that the Debtor has more than doubled its personnel, and is current with its post-petition suppliers and with respect to its post-petition tax obligations (R. 185–186).

IFC's cash flow problems in May, 1983 led it not only to accept Walden's proposal but, also, to enter into agreements with Messrs. Stein and Walden whereby it sold certain accounts receivable to them. In return, Stein and Walden caused suppliers to be paid so that IFC would continue to receive the supplies necessary for it to remain in business (R. 139–141, 144). The agreement with Stein called for him to pay the debt owed a particular supplier. The agreement with Walden had no such provision.

Nevertheless, it appears for purposes of this motion that the bills of several other unsecured creditors/suppliers were paid by Mr. Stein in full either shortly before or shortly after the petition was filed herein on June 1, 1983 (H. Exs. 3, 4 and 5). In one instance the Debtor itself paid a pre-petition debt in the amount of $2,836.06 on June 3, 1983 (H. Ex. 4).[2]

Neither the movant (R. 393) nor the Debtor takes the position that the Debtor should be liquidated. Although it would not appear from a petition claiming assets of $467,775 as of March 31, 1983 as against secured debt of $135,000 that unsecured creditors would receive nil in liquidation, the United States Trustee so claims (R.

---

**2.** Huweiler Exhibit 5 is a list of pre-petition creditors alleged to have been paid in full May 31, 1983. It reflects total payments of $80,338.94. Huweiler Exhibits 3 and 4 are copies of 3 checks made to the order of two of the pre-petition creditors listed on Huweiler Exhibit 5. One check is drawn on the account of Joseph Stein, is dated June 3, 1983, and is made payable to the order of A–Z Electronics was paid $17,501.75. Exhibit 5 states that A–Z Electronics was paid $17,500.85. A second check also drawn on the account of Joseph

Stein, and dated June 3, 1983, is made payable to the order of Industrial Molding Corp. in the amount of $12,827.00, the same amount listed as having been paid to that creditor by May 31, 1983. A third check, drawn on the Debtor's account, and dated June 3, 1983, is made payable to the order of Industrial Molding Corp. in the amount of $2,836. On the basis of this showing, we find incredible and not worthy of belief Exhibit 5's statement that all the creditors listed thereon were paid prior to May 31, 1983.

409), apparently on the strength of the evidence (see H. Ex. 10) that the Debtor had nearly exhausted its inventory in the two months from March 31, 1983, the date of the financial information stated on the petition, to June 1, 1983, the date the petition was filed.

But from whom the Debtor is to obtain the refinancing necessary for its survival is sharply disputed. Huweiler avers that such financing is to be found only in California because any investor would insist on examining IFC's operations (R. 98–99). The Debtor, with equal force, asserts that up to $500,000 post-petition financing has already been found in New York (see Debtor's Exhibit J) and that additional funds are to be found from a group of people of substance who have invested with Walden in other companies and have indicated their interest in following his lead in investing in IFC (R. 176–180, 212–213). All of these people reside in New York except for one investor from Hartford, Connecticut.

The Debtor further asserts that having the proceeding remain in New York would facilitate Walden's being able to keep in touch with these investors and to attract their funds (R. 208–212). To this it adds the proposition that venture capitalists in California have a broad opportunity to invest in high technology companies engaged in start-up phases of the computer industry. According to the Debtor, their interest in IFC would not be great since IFC sells in a market already entered by established companies (R. 250–251).

Speculation aside, it appears that IFC during the first five months of 1983 unsuccessfully attempted to raise capital in California. Other than Walden, it failed to attract serious investor interest due to a lack of sales (R. 76). Although Huweiler did gain the attention of two prospective California investors in May, 1983, he has not discussed IFC with them since. Indeed, he states that "I don't see there is a business interest in investing in IFC" (R. 115–117). The only prospect for post-petition financing seems, at this time, to be with Walden and his group.

Although the day-to-day management of the Debtor occurs in California (R. 314–315), Walden spends approximately half his time in New York (R. 171–172). Here he is able to be in personal contact with his investors and obtains business advice. One such contact resulted in a cost analysis of IFC products that enabled IFC to charge higher prices (R. 212–213). The Debtor also hopes, through additional financing, to lease warehouse space from which to ship replacement filters to customers in the eastern third of this country (R. 273–275, 307–308). While in California, Walden "fulfills his function as President which is to tie all the activities of the various managers together into an effective whole" (R. 313). As this statement suggests, management meetings are held in California, not New York (R. 314).

## II

In the haze created by the parties in their dispute over control of the Debtor, it has become clear that this case was filed in an improper district. Proper venue for bankruptcy cases, as provided in 28 U.S.C. Sec. 1472, lies in the district in which the domicile, residence, principal place of business in the United States, or principal assets in the United States of the Debtor ... were located for the 180 days immediately preceding "commencement of the case."

At the hearing on this matter, the Debtor's chairman, Mr. Walden, conceded that both the principal place of business and the principal assets of the Debtor for the period were located in California (R. 226). It also being self-evident from the facts of this case as adduced at the hearing that this case was filed in an improper district under 28 U.S.C. Sec. 1472, the issue presented here is whether the case should, nevertheless, be retained "in the interest of justice and for the convenience of the parties" as provided in 28 U.S.C. Sec. 1477.

In the application of this discretionary test (see *In re S.O.S. Sheet Metal Co.*, 297 F.2d 32 (2d Cir.1961)) it has not been gainsaid that the motivations of the movant here have very little to do with either jus-

tice or convenience. As guarantor of the Debtor's obligations to Foothills Capital Corp. ("Foothill"), he desires to be returned to management, have the Walden Factoring Agreement set aside, have the case transferred to California and quickly converted to Chapter 7 apparently so that Foothills' purported collateral can be sold and its proceeds applied in reduction of the debt he guaranteed (see Dr. Ex. L, R. 109–110).

■ This desire for self-preservation, however deeply rooted in our culture as it may be, is not one of the elements of informed discretion that this Court is to apply. *Cf. In re Hadar Leasing International Co.,* 14 B.R. 819 (S.D.N.Y.1981). The "interests of justice" side of the equation concerns the interests of the Debtor in rehabilitating itself, the interests of the creditors in receiving a fair and equitable return, the interests of the public and whether the pendency of the proceeding in the wrongful district advances or retards those interests. *C.f. Barnes v. Whelan,* 689 F.2d 193, 206 (D.C.Cir.1982).

The factors relevant to the convenience of the parties have most prominently been particularized in the leading recent venue case: *In re Commonwealth Oil Refining Company, Inc.,*[3] 596 F.2d 1239 (5th Cir. 1979), *cert. denied* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). As there set forth by the Fifth Circuit, those factors include but are not limited to:

"1. The proximity of creditors of every kind to the Court;

2. The proximity of the bankrupt (debtor) to the Court;

3. The proximity of the witnesses necessary to the administration of the estate;

4. The location of the assets;

5. The economic administration of the estate;

6. The necessity for ancillary administration if bankruptcy should result."

596 F.2d at 1247. *Accord, In re Louis Marx & Co., Inc.,* 6 B.C.D. 300 (Bkrtcy.S.D.N.Y. 1980); *In re Macon Uplands Venture,* 5 B.C.D. 1279 (D.Md.1980). These various factors, however, shift in emphasis in each case since "each case must stand on its own facts." *In re Developers of Caguas, Inc.,* 26 B.R. 977, 980 (Bkrtcy.E.D.N.Y.1983).

But, in almost every operating Chapter 11 case, a principal concern, whether the test be phrased in terms of the interests of justice or convenience, is the economic administration of the estate. In practical terms, that concern translates into inquiry of the need for post-petition financing pursuant to Sec. 364 of the Code, the need to obtain financing to fund a plan of arrangement and the location of the sources of that financing and the management personnel in charge of obtaining it. *In re Boca Development Associates,* 18 B.R. 648, 654 (Bkrtcy.S. D.N.Y.1982); *Cf. In re Commonwealth Oil Refining Co., Inc., supra,* 596 F.2d at 1248. Such facts are crucial in that they bear on the success of the rehabilitation generally contemplated by Chapter 11. *See In re Fairfield Puerto Rico, Inc.,* 333 F.Supp. 1187 (D.Del.1971).

At the other end of the spectrum are considerations, such as the location of the assets, which have greater weight if the proceeding is brought in Chapter 7. An adjudication of a Debtor likely requires greater court supervision over liquidation of the assets and there is no need to obtain financing. In such cases requiring the appointment of a trustee, it makes no sense to separate the trustee from the assets he is to liquidate or from the books and records he should examine. Where adjudication is in the offing, fairness to the creditors and the need for supervision strongly support placement of venue where the assets are located. That location, however, "is of little importance in a Chapter 11 proceeding where the goal is financial rehabilitation, not liquidation." *In re Commonwealth Oil Refining Company, Inc., supra,* 596 F.2d at 1248.

---

3. *In re Commonwealth Oil Refining Co., Inc., supra,* was decided under the Bankruptcy Act, since repealed. The factors articulated there, however, apply to 28 U.S.C. Sec. 1472 and Sec.

1477 since those sections track former Bankruptcy Rule of Procedure 116(a)(2) and 116(b)(2) governing venue under the Bankruptcy Act.

In between are concerns related to the proximity of the bankrupt, creditors and witnesses to the court. Because of the ability to take discovery outside the forum district, these concerns relate more to convenience than to the interests of justice although there may well be cases where inconvenience is so great that it creates injustice. Holders of small claims, in particular, may find a far away forum so expensive to reach as to preclude them from proving their claims if those claims are disputed. They also may better be able to make their views known to a creditors committee or trustee and to otherwise participate in the proceeding were the proceeding not located 3,000 miles away.

But, as appealing as that factor is, in *Commonwealth Oil* it gave way to the goal of financial rehabilitation. There small creditors were located in Puerto Rico, the location of the Debtor's assets. Several large creditors urged retention of the case in San Antonio. Their claims were such that they could afford to go anywhere to assert them. Small creditors had no such luxury. Even so, the case was retained in San Antonio. Nevertheless, it is submitted that if the inconvenience of creditors speaks in favor of transfer, the interests of justice require that more than a minimal showing of financial rehabilitation is possible be made for that proposition to prevail. Otherwise, the interests of creditors might be sacrificed in search of an ephemeral goal.

## III

Here both sides have bootstrapped their positions to the interests of unsecured creditors, most of whom are located in California. The movant claims that creditors are best served by transfer to California while conceding that financing for the Debtor is unavailable in California. The Debtor claims that creditors will be best served by retention of venue in the jurisdiction where financing is sought and has been partially obtained. Since the movant never sought, pursuant to Bankruptcy Rule of Procedure 1014(a), to give notice of its motion to the creditor body, and since the Debtor failed to request that this Court compel such notice, the creditors were never afforded the opportunity to express the interests that each side would attribute to them.

While the presence of such expression by the creditor body of its own best interests would not be decisive, its absence effectively diminishes the weight each side would attribute to its uninformed view of the preference of such creditors. All that can be said here is to observe that the United States Trustee has been unable to form a creditors committee in this case and note that the general proposition regarding the possible prejudice to small unsecured creditors from a proceeding far distant from their places of doing business, as noted above, remains unimpeded.

As for Foothills Capital Corporation, alleged to be a secured creditor, it has joined in the motion to transfer on the stated ground that venue in New York made it impossible to participate in the proceeding. (Damja affidavit). Counsel for Foothills has appeared in the proceeding, however, and noted that his appearance contradicts that statement and that venue as to any adversary proceeding involving Foothills can be separately considered under 28 U.S.C. Sec. 1475 (R. 7).

Consideration of the presence of witnesses necessary to the administration of the estate is not at all conclusive in this case. Witnesses to be called during the course of the proceeding conceivably include not only those in charge of the day-to-day business of the Debtor in California but, also, Walden in New York and perhaps prospective investors concededly in New York. It would appear that IFC's basic books and records can be transported to New York since they would fit in an average size carton (R. 327). In any event, modern discovery devices lessen the concern that full and fair discovery cannot be had far from the courthouse.

This case thus centers on two propositions: (1) Balancing all of these factors, should venue be retained here because the financing the Debtor hopes to obtain in order to rehabilitate itself has been in part obtained in New York and the only source of the additional financing required is, ap-

parently, located in New York; and (2) should this case be retained in New York in view of the evidence presented at the hearing concerning the post-petition payment of pre-petition debts, the Walden Factoring Agreement and engagement of an attorney and accountants without the approval of this Court and filing of inaccurate financial statements. No particular public interests (see *Commonwealth Oil, supra,* 596 F.2d at 1248) have been identified by the parties as bearing on these issues.

The first of these questions assumes that the Debtor can be rehabilitated. It is generally the rule that "anticipation of the failure of the Chapter 11 proceeding is an illogical basis on which to base a transfer." *In re Fairfield Puerto Rico, Inc., supra* at 1191. But, if it becomes apparent at the hearing that a Chapter 11 plan cannot be confirmed, or that the Debtor's house is in such disarray, and that efforts have not been made to right the sinking ship, then it makes no sense not to consider that factor in applying the interests of justice as required by 28 U.S.C. Sec. 1477.

Here the evidence of the Debtor's post-petition operations is concededly inaccurate and the accurate financial information concerning the Debtor's pre-petition affairs is so scanty [4] that they give little, if any, assurance that the rehabilitation necessary to afford unsecured creditors with a return is truly in the offing. All that can be said with certainty is that the Debtor, apparently due to the Walden Factoring Agreement, has, since the filing of the petition, continued in existence and doubled its employees. Sales have increased marginally although the parties differ in whether that increase is due to a backlog of firm orders.

But, the Debtor has other problems resulting from the practices noted at the commencement of this opinion. That some pre-petition unsecured creditors have been paid post-petition gives doubt as to whether a plan paying less than 100% to other pre-petition creditors would necessarily and improperly afford different treatment to members of the same class of creditors (see

Code Sec. 1122). The Walden Factoring Agreement may raise its own problems through the failure to have it considered by this Court pursuant to Section 363(b) of the Code. If the sale of accounts receivable and Walden's security interest provided therein were to be challenged, it would seem that the likelihood of continued post-petition financing and ultimate funding of a plan might sharply abate.

Nevertheless, it can be said that there is a certain logic to retaining venue in New York since the investors in Walden's group are in New York and employ accountants and attorneys in New York. In New York they could monitor the proceeding more conveniently than if venue were transferred to California.

On this issue, because of the uncertainties posed by the Debtor, whether to retain venue here on this basis is a close case. Refinancing is often crucial to the success of a Chapter 11 proceeding. What gives us pause is whether refinancing and an acceptable Chapter 11 is at all possible in view of the Debtor's conduct.

That concern in this case merges the second issue noted above. Because of the involvement of current management in these breaches of bankruptcy practice, because the Debtor has twice filed inaccurate post-petition financing statements with the United States Trustee and with the Clerk of this Court, and professes no concern at having done so, because attorneys and accountants have been hired and possibly paid without retention orders in violation of Section 327 of the Code, and for other cause, the United States Trustee has moved for an order converting, pursuant to Sec. 1112 of the Code, this case to Chapter 7 or, in the alternative, appointing an operating trustee pursuant to Sections 1104 of the Code and 151104 of the Code.

It is at this point that the balance tipping toward retention of this case under 28 U.S.C. Sec. 1477 shifts to transferring this proceeding to California. These failures and the possible need for appointment of a

---

4. For example, Huweiler, as noted, testified that IFC would break even at sales of $100,000

per month—a plateau that an IFC financial statement states was reached in May, 1983.

trustee raise the spectre of significant logistical difficulties that might be encountered by an operating trustee stationed in New York running a business in California. The same difficulties might be encountered by a California trustee performing his duties with respect to the Debtor under the appointment of a Court 3,000 miles distant. While the Debtor may be able to bifurcate its management so that Mr. Agnew runs the day-to-day business of the Debtor in California, and Mr. Walden sets policy during his trips to California and seeks financing in New York, that bifurcation may be impossible for a trustee and may affect the performance of his duties. Were the distance not so great, the burden might be less.

These failures also give doubt to the assumption underlying the basic proposition urged by the Debtor: that venue should be retained in New York to facilitate its rehabilitation. As noted, the Debtor's possible adjudication is generally not an element to be considered on a motion to transfer venue. But here we have serious doubt that rehabilitation can be accomplished in view of the post-petition conduct of this Debtor, and its flouting of the standards imposed on a Debtor-in-Possession. Subsequent developments may bear out Mr. Walden's faith and these problems may be rectified. Time will tell. But, the inability of this Debtor to perform as a Debtor-in-Possession gives no assurance in that regard.

In view of these doubts as to the Debtor's ability to reorganize, the need for effective administration by a trustee in this case, that this case was filed in the wrong venue under 28 U.S.C. Sec. 1472 and given the general proposition that small creditors might be better able to participate in the proceeding were it to be transferred to a Bankruptcy Court in a district located in a state where the creditors do business and did business with the Debtor, we hold that the balance of interests of justice and convenience tips in favor of transferring this proceeding to the proper venue.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The Clerk is directed to transfer the proceeding to the United States Bankruptcy Court for the Central District of California.

IT IS SO ORDERED.